Michael C. McKay (023354)
**MCKAY LAW, LLC**
5635 N. Scottsdale Road, Suite 117
Scottsdale, Arizona 85250
Telephone: 480-681-7000
Facsimile: 480-348-3999
Email: mmckay@mckaylaw.us

Marc H. Edelson (*pro hac vice* anticipated)
Eric Lechtzin (*pro hac vice* anticipated)
**EDELSON LECHTZIN LLP**
3 Terry Drive, Suite 205
Newtown, Pennsylvania 18940
Telephone: (215) 867-2399
Facsimile: (267) 685-0676
Email: medelson@edelson-law.com
Email: elechtzin@edelson-law.com

*Attorneys for Samantha Gotta and Michael De Sena*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Samantha Gotta and Michael De Sena, individually and on behalf of the Stantec 401(k) Plan, | Case No. _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | |
| Stantec Consulting Services, Inc.; The Board of Directors of Stantec Consulting Services, Inc.; Stantec Consulting Services, Inc. Fiduciary Investment Committee; and John Does 1-30, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiffs Samantha Gotta and Michael De Sena ("Plaintiffs"), by and through their undersigned attorneys, on behalf of the Stantec 401(k) Plan ("Plan")[1], themselves, and all others similarly situated, allege as follows.

## I.    INTRODUCTION

1.    This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1109 and 1132, against the Plan's fiduciaries, which include Stantec Consulting Services Inc., ("Stantec" or the "Company"), the Board of Directors of Stantec Consulting Services Inc. and its members ("Board") during the Class Period (defined below), and the Stantec 401(k) Plan Fiduciary Investment Committee, and its members ("Committee") during the Class Period for breaches of their fiduciary duties. Defendants, Stantec Consulting Services Inc., the Board and the Committee are referred to collectively as "Defendants."

2.    Defined contribution retirement plans, like the Plan, confer tax benefits on participating employees to incentivize saving for retirement. According to the Investment Company Institute, Americans held $7.9 trillion in all employer-based defined contribution retirement plans as of March 31, 2020, of which **$5.6 trillion was held in 401(k) plans**. *See* INVESTMENT COMPANY INSTITUTE, *Retirement Assets Total*

---

[1] The Plan is a legal entity that can sue and be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party. Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

*$28.7 Trillion in First Quarter 2020* (June 17, 2020).

3.      In a defined contribution plan, "participants' retirement benefits are limited to the value of their own individual investment accounts, which is determined by the market performance of employee and employer contributions, less expenses." *Tibble v. Edison Int'l*, 575 U.S. 523 (2015). Because all risks related to high fees and poorly performing investments are borne by the participants, the employer has little incentive to keep costs low or to closely monitor the Plan to ensure every investment remains prudent.

4.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries. 29 U.S.C. § 1104(a)(1). These twin fiduciary duties are "the highest known to the law." *Sweda v. Univ. of Pennsylvania*, 923 F.3d 320, 333 (3d Cir. 2019). Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B).

5.      Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an

account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1825 (2015).

6.      The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).

7.      As of December 31, 2018, the Plan had $1,125,689,446 in assets, which qualifies it as a mega plan in the defined contribution 401(k) marketplace. As a mega plan, the Plan has substantial bargaining power regarding the fees and expenses that are charged against participants' investments. However, instead of leveraging the Plan's tremendous bargaining power to benefit participants and beneficiaries, Defendants' chose poorly performing investments, inappropriate, high cost mutual fund share classes, and caused the Plan to pay unreasonable and excessive fees for recordkeeping and other administrative services.

8.      However, to the extent that Defendants made any attempt to reduce the Plan's expenses or to monitor and review the Plan's investment options, Defendants employed flawed and ineffective processes, which failed to ensure that: (a) the fees and expenses charged to Plan participants were reasonable, and (b) that each investment option that was offered in the Plan was prudent.

9.      Defendants' mismanagement of the Plan constitutes a breach of the fiduciary duty of prudence in violation of 29 U.S.C. § 1104. Their actions (and omissions) were contrary to actions of a reasonable fiduciary and cost the Plan and its

participants millions of dollars.

## II.    JURISDICTION AND VENUE

10.    This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e)(1) and 28 U.S.C. § 1331 because it is an action under 29 U.S.C. § 1132(a)(2) and (3).

11.    This Court has personal jurisdiction over Defendants because they are headquartered and transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

12.    This District is the proper venue for this action under 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391(b) because it is the District in which the Plan is administered, where at least one of the alleged breaches took place and where Defendants reside.

## III.    STANDING

13.    An action under 29 U.S.C. § 1132(a)(2) allows recovery only for a plan and does not provide a remedy for individual injuries distinct from plan injuries. *See LaRue v. DeWolff, Boberg & Assocs., Inc.*, 552 U.S. 248, 256 (2008). The plan is the victim of any fiduciary breach and the recipient of any recovery. *See LaRue*, 552 U.S. at 254. Under 29 U.S.C. § 1132(a)(2), any participant, fiduciary, or the Secretary of Labor is authorized to sue derivatively as a representative of a plan to seek relief on behalf of the plan. 29 U.S.C. § 1132(a)(2).

14.     As explained below, the Plan suffered millions of dollars in losses resulting from Defendants' fiduciary breaches and remains exposed to harm and continuing losses, and those injuries may be redressed by a judgment of this Court in favor of Plaintiffs. To the extent Plaintiffs must also show an individual injury, even though 29 U.S.C. § 1132(a)(2) does not provide redress for individual injuries, Plaintiffs have suffered such an injury, in at least the following ways:

15.     Plaintiffs and all participants in the Plan suffered financial harm as a result of the imprudent investment options in the Plan because Defendants' selection and retention of those options deprived participants of the opportunity to grow their retirement savings by investing in prudent options with reasonable fees, which would have been available in the Plan if Defendants had satisfied their fiduciary obligations. Thus, all participants continue to be harmed by the ongoing inclusion of these imprudent options.

16.     Plaintiffs' individual accounts in the Plan were harmed because they invested in investment options that would have been removed from the Plan had Defendants discharged their fiduciary duties. These investment options underperformed numerous prudent alternatives that were available to the Plan, resulting in a loss of retirement savings.

## IV.     PARTIES

### Plaintiffs

17.     Plaintiff Samantha Gotta, an adult individual who currently resides in Chicago, Illinois, was employed by Stantec during the period from March 2017 to April

2020. During her employment, Plaintiff Gotta participated in the Plan and invested in the JPMorgan SmartRetirement 2050 Fund Class R6 (49 bps).[2]

18.     Plaintiff Michael De Sena, an adult individual who currently resides in Washington Township, New Jersey, was employed by Stantec from September 1993 to September 2017. During his employment, Plaintiff De Sena participated in the Plan and invested in the Vanguard Small Cap Value Fund (37 bps), Dodge & Cox International Stock Fund (65 bps), BlackRock Large Cap Value Class I Fund (103 bps), JPMorgan Mid Cap Value Fund (100 bps), and the Harbor Capital Appreciation Fund Admin Class (93 bps).

**Company Defendant**

19.     Stantec Consulting Services Inc., which maintains its principal place of business at 8211 South 48th Street, Phoenix, Arizona, is the Plan sponsor and a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because: (a) Stantec is a named fiduciary under the Plan, (b) during the Class Period, it exercised discretionary authority and control over Plan management and/or authority or control over management or disposition of Plan assets, and (c) acting through the Board, it appointed the Committee to serve as a fiduciary of the Plan.

20.     Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

21.     At all times relevant to this action, Stantec Consulting has been

---

[2] The expense ratios for Plaintiff's Plan investments are in parentheses and expressed in basis points, which is one hundredth of a percent or equivalently 0.01%.

responsible for the administrative and investment responsibilities associated with the Plan and has been the "named fiduciary" as defined under ERISA.

**Board Defendants**

22.     The Board of Directors appointed the members of the Committee. Accordingly, the Board had the fiduciary duty to monitor and supervise the Committee while it performed its role as the fiduciary responsible for selection and monitoring of the Plan's investments.

23.     Each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is or was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period, because each exercised discretionary authority to appoint and monitor the Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

24.     The Board and its unnamed members during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

**Committee Defendants**

25.     The Administrative Committee is appointed by the Board and is responsible for selecting the funds which are available to Plan participants for investment. Additionally, the Committee is charged with the responsibility to review the Plan's investment options on an annual basis.

26.     The Committee is governed by the Investment Policy Statement which further details the Fiduciary Committee's responsibilities. Stantec Consulting Services

Inc. 401(k) Savings Plan Trust Investment Policy Statement Updated as of March 2019 ("IPS"). The IPS provides that the Fiduciary Committee "has responsibility for assisting in the administration of the Plan with respect to investment matters, including evaluating investment options; and selecting investment options. IPS at 2.

27.     The Committee is also responsible for appointing the Plan trustee. The Plan Document provides: "[t]he Fiduciary Committee shall have the authority to … choose the Trustee." *Id.*

28.     The Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because each exercised discretionary authority over management or disposition of Plan assets.

29.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

30.     To the extent that there are additional officers and employees of Stantec Consulting who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1-30 include, but are not limited to, Stantec Consulting officers and employees who are/were fiduciaries of the Plan within the

meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

## V. THE PLAN

31. The Plan, established in 1979 (restated December 21, 2016, effective January 1, 2017, amended November 1, 2017) is a defined contribution and profit-sharing 401(k) plan covering all "non-excluded employees," as defined by the Plan Document.

32. Stantec employees become eligible for the employer matching contribution upon reaching the later of their one month anniversary of hire or age 21. Stantec Consulting Services Inc. 401(k) Savings Plan Notes to Financial Statements for December 31, 2018, at 6 ("2018 Auditor Report").

33. The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.

34. Participants may contribute to their individual accounts by way of:

- salary deferral contribution;

- employer matching contribution; and

- rollover contributions from other defined contribution plans.

35. With regard to employee contributions, employees may contribute "pre-

-10-

tax and after-tax deferrals of at least 1% up to 75% of their compensation for the Plan year or up to the maximum limits established by the Internal Revenue Service ("IRS"), whichever is lower." 2018 Auditor Report at 6.

36.    Stantec Consulting's 'matching contributions are discretionary and are calculated at 100% of each participant's contributions up to the first 3% of compensation, plus 50% of each participant's contributions equal to the next 2% of compensation." *Id.*

37.    Under the Plan, a participant is 100% vested in their salary deferral contributions and any rollover account contributions, regardless of the length of service. 2018 Auditor Report at 6. "Participants are also immediately vested in the Company's matching contributions, and any investment earnings thereon." *Id.*

**The Plan's Investment Options**

38.    Various mutual funds were available to Plan participants for investment during the Class Period, including funds from JPMorgan, Wells Fargo, Dodge & Cox, T. Rowe Price, Invesco, Pimco and Vanguard. The Committee is responsible for determining the appropriateness of each of the Plan's investment options and is required to monitor investment performance.

39.    The Plan's investment options as of December 31, 2018 are set forth below:

| Ticker | Fund Name | Value of Plan Assets | Net Expense Ratio |
|---|---|---|---|
| AADEX | American Beacon Large Cap Value R5 | $ 40,339,004 | 0.63 % |
| MALOX | BlackRock Global Allocation Fund Class I[3] | $ 41,069,780 | 0.85 % |
| RRRRX | DWS RREEF Real Estate Securities Instl. | $ 9,340,508 | 0.63 % |
| DODFX | Dodge & Cox International Stock Fund | $ 38,028,786 | 0.63 % |
| DODIX | Dodge & Cox Income | $ 72,593,973 | 0.42 % |
| HACAX | Harbor Capital Appreciation Instl[4] | $ 106,579,743 | 0.72 % |
| ODVIX | Invesco Oppenheimer Developing Mkts R6 | $ 21,250,904 | 0.83 % |
| JTTYX | JPMorgan SmartRetirement 2020 R6 | $ 33,290,219 | 0.45 % |
| JNSYX | JPMorgan SmartRetirement 2025 R6 | $ 53,082,012 | 0.46 % |
| JSMYX | JPMorgan SmartRetirement 2030 R6 | $ 42,112,004 | 0.47 % |
| SRJYX | JPMorgan SmartRetirement 2035 R6 | $ 35,956,651 | 0.48 % |
| SMTYX | JPMorgan SmartRetirement 2040 R6 | $ 30,184,991 | 0.49 % |
| JSAYX | JPMorgan SmartRetirement 2045 R6 | $ 28,881,373 | 0.49 % |
| JTSYX | JPMorgan SmartRetirement 2050 R6 | $ 38,082,798 | 0.49 % |
| JFFYX | JPMorgan SmartRetirement 2055 R6 | $ 395,635 | 0.50 % |
| JAKYX | JPMorgan SmartRetirement 2060 R6 | $ 560,904 | 0.59 % |
| JSIYX | JPMorgan SmartRetirement Income Fund R6 | $ 17,401,507 | 0.52 % |
| FLMVX | JPMorgan Mid Cap Value L[5] | $ 53,967,521 | 0.86 % |
| PHIYX | PIMCO High Yield Instl | $ 10,147,976 | 0.59 % |
| PAUIX | PIMCO All Asset All Authority Institutional | $ 2,727,927 | 1.24 % |
| RPTIX | T. Rowe Price Mid-Cap Growth I | $ 75,809,617 | 0.61 % |
| VTMNX | Vanguard Developed Markets Index Instl | $ 34,955,013 | 0.05 % |
| VSIIX | Vanguard Small Cap Value Index I | $ 41,326,032 | 0.06 % |
| VSGIX | Vanguard Small Cap Growth Index I | $ 40,449,581 | 0.06 % |
| VIIIX | Vanguard Institutional Index Fund Institutional Plus | $ 132,095,774 | 0.02 % |
| -- | Wells Fargo Stable Return Fund | $ 98,407,299 | 0.45 % |

[3] The lower cost share class BlackRock Global Allocation K (MKLOX), has a net expense ratio of 0.72%.
[4] The lower cost share class Harbor Capital Appreciation Ret. (HNACX), has a net expense ratio of 0.59%.
[5] The lower cost JPMorgan Mid Cap Value R6 (JMVYX), has a net expense ratio of 0.73%.

40. According to the annual report on Form 5500, the total value of Plan's assets was $1,125,685,909 as of December 31, 2018.

## VI.   CLASS ACTION ALLEGATIONS

41. Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23 on behalf of herself and the following proposed class ("Class"):[6]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between September 23, 2014 and the present (the "Class Period").

42. The members of the Class are so numerous that joinder of all members is impractical. According to the 2018 Form 5500 filed with the U.S. Department of Labor, there were 12,152 Plan participants with account balances, as of December 31, 2018.

43. Plaintiffs' claims are typical of the claims of the members of the Class. Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

44. There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.

---

[6] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Common legal and factual questions include, but are not limited to:

> A.   Whether Defendants are fiduciaries of the Plan;
>
> B.   Whether Defendants breached their fiduciary duty of prudence by engaging in the conduct described herein;
>
> C.   Whether the Company and Board Defendants failed to adequately monitor the Committee and other fiduciaries to ensure the Plan was being managed in compliance with ERISA;
>
> D.   The proper form of equitable and injunctive relief; and
>
> E.   The proper measure of monetary relief.

45.   Plaintiffs will fairly and adequately represent the Class, and have retained counsel experienced and competent in the prosecution of ERISA class action litigation. Plaintiffs have no interests antagonistic to those of other members of the Class. Plaintiffs are committed to the vigorous prosecution of this action, and anticipate no difficulty in the management of this litigation as a class action.

46.   This action may be properly certified under Fed. R. Civ. P. 23(b)(1). Class action status in this action is warranted under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Fed. R. Civ. P. 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

47.   In the alternative, certification under Fed. R. Civ. P. 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## VII.   DEFENDANTS' FIDUCIARY STATUS AND OVERVIEW OF FIDUCIARY DUTIES

48.   ERISA requires every covered retirement plan to provide for one or more named fiduciaries who will have "authority to control and manage the operation and administration of the plan." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1).

49.   ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), 29 U.S.C. § 1102(a)(1), but also any other persons who in fact perform fiduciary functions. Thus, a person is a fiduciary to the extent: "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercise any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." ERISA § 3(21)(A)(i), 29 U.S.C. § 1002(21)(A)(i).

50.   As described above, Defendants were fiduciaries of the Plan because:

A.   they were so named; and/or

B.   they exercised authority or control respecting management or disposition of the Plan's assets; and/or

C.   they exercised discretionary authority or discretionary control respecting management of the Plan; and/or

D.   they had discretionary authority or discretionary responsibility in the administration of the Plan.

51.     As fiduciaries, Defendants are/were required by ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), to manage and administer the Plan, and the Plan's investments, solely in the interest of the Plan's participants and beneficiaries and with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims. These twin duties are referred to as the duties of loyalty and prudence, and they are "the highest known to the law." *Sweda*, 923 F.3d at 333.

52.     The duty of loyalty requires fiduciaries to act with an "eye single" to the interests of plan participants. *Pegram v. Herdrich*, 530 U.S. 211, 235 (2000) (internal citations omitted). "Perhaps the most fundamental duty of a [fiduciary] is that he [or she] must display…complete loyalty to the interests of the beneficiary and must exclude all selfish interest and all consideration of the interests of third persons." *Id.* at 224 (quotation marks and citations omitted).

53.     "Thus, in deciding whether and to what extent to invest in a particular investment, ***a fiduciary must ordinarily consider only factors relating to the interests of plan participants and beneficiaries in their retirement income***. A decision to make an investment may not be influenced by non-economic factors unless the investment,

*when judged solely on the basis of its economic value to the plan*, would be equal or superior to alternative investments available to the plan." *U.S. Dep't of Labor ERISA Adv. Op*. 88-16A, 1988 WL 222716, at *3 (Dec. 19, 1988) (emphasis added).

54. In effect, the duty of loyalty includes a mandate that the fiduciary display complete loyalty to the beneficiaries and set aside the consideration of third persons. *See In re WorldCom, Inc.*, 263 F. Supp. 2d 745, 758 (S.D.N.Y. 2003) ("An ERISA fiduciary must 'conduct a careful and impartial investigation' of the merits and appropriate structure of a plan investment.") (quoting *Flanigan v. Gen. Elec. Co.*, 242 F.3d 78, 86 (2d Cir. 2001)).

55. ERISA also "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exist in a plan, which is "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble*, 575 U.S. 523. "[A] fiduciary cannot free himself from his duty to act as a prudent man simply by arguing that other funds...could theoretically, in combination, create a prudent portfolio." *In re Am. Int'l Grp., Inc. ERISA Litig. II*, No. 08 CIV. 5722 LTS KNF, 2011 WL 1226459, at *4 (S.D.N.Y. Mar. 31, 2011) (quoting *DiFelice v. U.S. Airways, Inc.*, 497 F.3d 410, 418 n.3, 423–24 (4th Cir. 2007)).

56. In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by co-fiduciary") provides:

> [I]n addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission is a breach; (B) if, by his failure to comply with section 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

57. During the Class Period, Defendants did not act in the best interests of the Plan's participants. Investment options chosen for a plan should not favor the fund provider over the plan's participants. Yet, here, to the detriment of the Plan and their participants and beneficiaries, the Plan's fiduciaries included and retained in the Plan many investment options that were more expensive than necessary and otherwise were not justified on the basis of their economic value to the Plan.

58. Based on reasonable inferences from the facts set forth in this Complaint, during the Class Period Defendants failed to have a proper system of review in place to ensure that participants in the Plan were being charged appropriate and reasonable fees for each of the Plan's investment options. Additionally, Defendants failed to leverage the size of the Plan to negotiate the lowest expense ratio available for certain investment options maintained and/or added to the Plan during the Class Period.

59. As set forth in detail below, Defendants breached fiduciary duties to the Plan and its participants and beneficiaries and are liable for their breaches and the

breaches of their co- fiduciaries under 29 U.S.C. §§ 1104(a)(1) and 1105(a).

## VIII.  SPECIFIC ALLEGATIONS

### A.   Improper Management of the Plan Cost the Plan's Participants Millions in Savings

60.    Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must provide diversified investment options for a defined-contribution plan while also giving substantial consideration to the cost of those options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act (the "UPIA") § 7.

61.    "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'" *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197–98 (9th Cir. 2016) (quoting Restatement (Third) of Trust § 90, cmt. b). *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Aug. 2013) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan ... Employers are held to a high standard of care and diligence and must discharge their duties solely in the interest of the plan participants and their beneficiaries.").[7]

62.    As the Ninth Circuit explained, higher fees of only 0.18% to 0.4% can

---

[7]    Available at:   https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited Sept. 22, 2020).

have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also 'lost investment opportunity'; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble*, 843 F.3d at 1198.

63.    The Ninth Circuit provided an example of the impact of higher fees over a 40-year period, stating:

> As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively.

*Id.* (footnotes omitted).

64.    Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement. "The 401(k) is the major source people think they are going to rely on."[8] Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices of plan sponsors and fiduciaries, whether due to poor performance, high fees, or both.

65.    Indeed, the Department of Labor has stated that employers are held to a "high standard of care and diligence" and must both "establish a prudent process for selecting investment options and service providers" and "monitor investment options

---

[8] Brandon, Emily, "10 Essential Sources of Retirement Income," (May 6, 2011), available at: https://money.usnews.com/money/retirement/slideshows/10-essential-sources-of-retirement-income (last visited Sept. 22, 2020).

and service providers once selected to see that they continue to be appropriate choices," among other duties. *See* "A Look at 401(k) Plan Fees," *supra*.

66.     The duty to evaluate and monitor fees and investment costs includes fees paid directly by plan participants to investment providers, usually in the form of an expense ratio or a percentage of assets under management within a particular investment. *See* Investment Company Institute ("ICI"), *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, at 4 (July 2016).[9] "Any costs not paid by the employer, which may include administrative, investment, legal, and compliance costs, effectively are paid by plan participants." *Id.* at 5.

67.     The fiduciary task of evaluating investments and investigating comparable alternatives in the marketplace is made much simpler by the advent of independent research from services like Morningstar, which categorizes funds to "help investors and investment professionals make meaningful comparisons between funds. The categories make it easier to build well-diversified portfolios, assess potential risk, and identify top-performing funds. [Morningstar] place funds in a given category based on their portfolio statistics and compositions over the past three years."[10]

68.     Thus, prudent and impartial plan fiduciaries should continuously monitor both the performance and cost of the investments selected for their 401(k) plans, as

---

[9] Available at: https://www.ici.org/pdf/per22-04.pdf (last visited Sept. 22, 2020).
[10] Available at http://www.morningstar.com/InvGlossary/morningstar_category.aspx (last visited Sept. 22, 2020).

well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

**B.    Defendants Breached Their Fiduciary Duties by Selecting More Expensive Share Classes Instead of Low-Cost Institutional Shares of the Same Funds**

69.    The Supreme Court reaffirmed the ongoing fiduciary duty to monitor a plan's investment options in *Tibble*, 575 U.S. 523. In *Tibble*, the Court held that "an ERISA fiduciary's duty is derived from the common law of trusts," and that "[u]nder trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones." *Id.* at 1828. In so holding, the Supreme Court referenced with approval the Uniform Prudent Investor Act ("UPIA"), treatises, and seminal decisions confirming the duty.

70.    The UPIA, which enshrines trust law, recognizes that "the duty of prudent investing applies both to investing and managing trust assets...." *Tibble*, 575 U.S. 523 (quoting Nat'l Conference of Comm'rs on Uniform State Laws, Uniform Prudent Investor Act § 2(c) (1994)). The official comment explains that "'[m]anaging embraces monitoring, that is, the trustee's continuing responsibility for oversight of the suitability of investments already made as well as the trustee's decisions respecting new investments." *Id*. § 2 comment.

71.    Under trust law, one of the responsibilities of the Plan's fiduciaries is to "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "significantly different costs." Restatement (Third) of Trusts ch. 17, intro. note (2007); *see also* Restatement (Third) of

Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function."). Adherence to these duties requires regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident," or if there is a "superior alternative investment" to any of the plan's holdings. *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 718–19 (2d Cir. 2013).

72.     As demonstrated by the chart below, in several instances during the Class Period, Defendants failed to prudently monitor the Plan to determine whether the Plan was invested in the lowest-cost share class available for the Plan's mutual funds, which are identical to the mutual funds in the Plan in every way except for their lower cost. The chart below uses 2020 expense ratios, the most recent data available, to demonstrate how much more expensive the share classes in the Plan are than available lower-cost share classes.

| Higher-Cost Share Class Funds Currently in the Plan | | | | |
|---|---|---|---|---|
| Fund in Plan | Value[11] | Net Expense Ratio[12] | Lower Cost Share Class of Same Fund | Net Expense Ratio[13] |
| MALOX BlackRock Global Allocation Fund Class I | $ 41,069,780 | 0.85% | MKLOX BlackRock Global Allocation K | 0.72% |
| HACAX Harbor Capital Appreciation Instl | $ 106,579,743 | 0.72 % | HNACX Harbor Capital Appreciation Ret. | 0.59% |
| FLMVX JPMorgan Mid Cap Value L | $ 53,967,521 | 0.86 % | JMVYX JPMorgan Mid Cap Value R6 | 0.73% |

---

[11] As of December 31, 2018.
[12] As of June 30, 2020.
[13] As of June 30, 2020.

| Higher-Cost Share Class Funds in the Plan as of December 31, 2017 | | | | |
|---|---|---|---|---|
| Fund in Plan | Value[14] | Net Expense Ratio[15] | Lower Cost Share Class of Same Fund | Net Expense Ratio[16] |
| JSIIX JPMorgan SmartRetirement Income R5 | $ 21,225,028 | 0.52% | JSIYX JPMorgan SmartRetirement Income Fund R6 | 0.42 % |
| JTTIX JPMorgan SmartRetirement 2020 Fund R5 | $ 38,368,010 | 0.54 % | JTTYX JPMorgan SmartRetirement 2020 R6 | 0.45 % |
| JNSIX JPMorgan SmartRetirement 2025 Fund R5 | $ 56,838,482 | 0.55 % | JNSYX JPMorgan SmartRetirement 2025 R6 | 0.46 % |
| JSMIX JPMorgan SmartRetirement 2030 Fund R5 | $ 46,604,431 | 0.56 % | JSMYX JPMorgan SmartRetirement 2030 R6 | 0.47 % |
| SRJIX JPMorgan SmartRetirement 2035 Fund R5 | $ 38,275,603 | 0.56 % | SRJYX JPMorgan SmartRetirement 2035 R6 | 0.48 % |
| SMTIX JPMorgan SmartRetirement 2040 Fund R5 | $ 30,876,830 | 0.57 % | SMTYX JPMorgan SmartRetirement 2040 R6 | 0.49 % |
| JSAIX JPMorgan SmartRetirement 2045 Fund R5 | $ 29,630,436 | 0.57 % | JSAYX JPMorgan SmartRetirement 2045 R6 | 0.49 % |
| JTSIX JPMorgan SmartRetirement 2050 Fund R5 | $ 34,517,636 | 0.57 % | JTSYX JPMorgan SmartRetirement 2050 R6 | 0.49 % |

73.     As the charts above illustrate, throughout the Class Period Defendants should have known of the existence and availability of lower-cost share classes, and they should have promptly transferred the Plan's investments in such funds to the least expensive share classes, however, with respect to at least 3 funds currently in the Plan, Defendants have failed to do so. Moreover, during the Class Period, Defendants selected 8 JPMorgan SmartRetirement R5 class funds for which lower-cost share classes were

---

[14] As of December 31, 2018.
[15] As of June 30, 2020.
[16] As of June 30, 2020.

available, but Defendants failed to transfer these investments to the less expensive R6 share class until after December 31, 2017. Even then, Defendants failed to select the lower cost collective investment trust versions of such funds. Defendants' failure to select the lowest-cost share class available caused Plan participants to pay excessive fees, which has and will continue to diminish the value of their individual 401(k) accounts.

74. Qualifying for lower share classes usually requires a minimum of a million dollars for individual funds. As demonstrated in the tables above, each of the funds had more than $1 million in assets, and therefore, the Plan would have easily qualified for lower share classes for these funds.

75. A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the cheaper share classes available and transferred the Plan's investments in the above-referenced funds into institutional shares at the earliest opportunity. Yet, despite the availability of lower-cost shares, Defendants did not transfer Plan holdings in any of these funds from higher-priced share classes into the lowest-cost institutional share classes, in breach of their fiduciary duties.

76. There is no good-faith explanation for utilizing a high-cost share class when a lower-cost share class is available for the exact same investment. The Plan did not receive any additional services or benefits based on its selection of more expensive share classes; the only consequence was higher costs for Plan participants.

### C. Defendants Breached Their Fiduciary Duties by Failing to Investigate and Select Comparable Lower Cost Funds

77. When mega plans, like the Plan here, have investment options that approach the retail cost of shares for individual investors or are simply more expensive than the average institutional shares for that type of investment, regular and careful reviews of each of the plan's investment options is needed for the fiduciaries to fulfill their obligations to plan participants.

78. Throughout the Class Period, the Plan's investment options have been dominated by high-cost, actively-managed funds, despite the fact that these funds charged grossly excessive fees compared with alternative funds that used the same investment style, and despite ample evidence available to a reasonable fiduciary that such funds had become imprudent due to their high costs.

79. During the Class Period, the Plan and its participants lost millions of dollars by offering investment options that had similar, if not identical, characteristics to other lower-priced investment options.

80. Most funds in the Plan stayed the same during the Class Period. Using services that are readily available to ERISA fiduciaries to analyze the current Plan offerings, as reported by Stantec's 2018 Form 5500, **18** out of the **26** funds in the Plan were significantly more expensive than comparable funds found in similarly-sized plans (plans having greater than $1 billion in assets). The expense ratios for funds in the Plan in some cases are as much as 147**%** greater than the expense ratio for comparable funds available to the Plan. *See*, *e.g.*, BrightScope/ICI Defined Contribution Plan Profile: *A*

*Close Look at 401(k) Plans, 2015* at 69 (March 2018) ("ICI Study").[17]

81.    The table below provides a comparison of the **18** funds that were available to Participants throughout the Class Period to substantially similar funds that are in the same Morningstar fund category and measure their performance against the same benchmark index (most of which have at least 90 percent similar holdings), but have significantly lower net expense ratios:

| Current Fund In Plan | Net Expense Ratio | Comparable Funds With Lower Fees | Net Expense Ratio |
|---|---|---|---|
| AADEX<br>**American Beacon Large Cap Value R5**<br>Benchmark Index: Russell 1000 Value TR USD | 0.63 % | VIVAX<br>**Vanguard Value Index Inv**<br>(superior performance over 1-, 3-, 5- & 10-year periods) | 0.17 % |
| | | VEIPX<br>**Vanguard Equity-Income Inv**<br>(superior performance over 1-, 3-, 5- & 10-year periods) | 0.27 % |
| | | SFLNX<br>**Schwab Fundamental US Large Company Idx**<br>(superior performance over 1-, 3-, 5- & 10-year periods) | 0.25 % |
| RRRRX<br>**DWS RREEF Real Estate Securities Instl.**<br>Benchmark Index: S&P United States REIT TR USD | 0.63 % | DFREX<br>**DFA Real Estate Securities I**<br>(superior performance over 1-, 3-, 5- & 10-year periods) | 0.18 % |
| | | VGSIX<br>**Vanguard Real Estate Index Investor**<br>(comparable performance) | 0.26 % |
| DODFX<br>**Dodge & Cox International Stock Fund**<br>Benchmark Index: MSCI ACWI Ex USA Value NR USD | 0.63 % | VTRIX<br>**Vanguard International Value Inv**<br>(superior performance over 1-, 3-, 5- & 10-year periods) | 0.37 % |
| DODIX<br>**Dodge & Cox Income**<br>Benchmark Index: BBgBarc US Universal TR USD | 0.42 % | BCOIX<br>**Baird Core Plus Bond Inst**<br>(superior performance over 1-, 3-, 5- & 10-year periods) | 0.30 % |
| | | TIBFX<br>**TIAA-CREF Core Plus Bond Instl**<br>(comparable performance) | 0.30 % |

---

[17] *See* https://cdn2.hubspot.net/hubfs/392606/y55434y55435y54.pdf (last visited Sept. 22, 2020).

| Current Fund In Plan | Net Expense Ratio | Comparable Funds With Lower Fees | Net Expense Ratio |
|---|---|---|---|
| JTTYX<br>**JPMorgan SmartRetirement 2020 R6**<br>Benchmark Index: Morningstar Lifetime Mod 2020 TR USD | 0.45 % | VITWX<br>**Vanguard Instl Trgt Retire 2020 Instl**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.09 % |
| | | FPIFX<br>**Fidelity Freedom® Index 2020 Investor**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.12 % |
| | | JSYRX<br>**JPMorgan SmartRetirement Blend 2020 R6**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.29 % |
| JNSYX<br>**JPMorgan SmartRetirement 2025 R6**<br>Benchmark Index: Morningstar Lifetime Mod 2025 TR USD | 0.46 % | VRIVX<br>**Vanguard Instl Trgt Retire 2025 Instl**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.09 % |
| | | LIBKX<br>**BlackRock LifePath® Index 2025 K**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.09 % |
| | | FQIFX<br>**Fidelity Freedom® Index 2025 Investor**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.12 % |
| JSMYX<br>**JPMorgan SmartRetirement 2030 R6**<br>Benchmark Index: Morningstar Lifetime Mod 2030 TR USD | 0.47 % | VTTWX<br>**Vanguard Instl Trgt Retire 2030 Instl**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.09 % |
| | | LINKX<br>**BlackRock LifePath® Index 2030 K**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.09 % |
| | | FXIFX<br>**Fidelity Freedom® Index 2030 Investor**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.12 % |
| SRJYX<br>**JPMorgan SmartRetirement 2035 R6**<br>Benchmark Index: Morningstar Lifetime Mod 2035 TR USD | 0.48 % | VITFX<br>**Vanguard Instl Trgt Retire 2035 Instl**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.09 % |
| | | LIJKX<br>**BlackRock LifePath® Index 2035 K**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.09 % |
| | | FIHFX<br>**Fidelity Freedom® Index 2035 Investor**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.12 % |

| Current Fund In Plan | Net Expense Ratio | Comparable Funds With Lower Fees | Net Expense Ratio |
|---|---|---|---|
| SMTYX<br>**JPMorgan SmartRetirement 2040 R6**<br>Benchmark Index: Morningstar Lifetime Mod 2040 TR USD | 0.49 % | VIRSX<br>**Vanguard Instl Trgt Retire 2040 Instl**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.09 % |
| | | LIKKX<br>**BlackRock LifePath® Index 2040 K**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.09 % |
| | | FBIFX<br>**Fidelity Freedom® Index 2040 Investor**<br>(superior performance over 1-, 3-, & 5-year periods) | 0.12 % |

82.     The comparisons in table above demonstrate that for at least **18** out of the **26** funds in the Plan as of December 31, 2018, there are many equivalent investments that would have cost participants far less than the funds selected for the Plan by Defendants.

83.     The chart above also demonstrates that the expense ratios of the Plan's investment options were more expensive by multiples of comparable alternative funds in the same investment style. A reasonable investigation by the Plan's fiduciaries would have revealed the existence of these lower cost alternatives and would have saved millions of dollars for the Plan and its participants and beneficiaries.

**D.     Failure to Adequately Utilize Available Lower Cost Collective Trusts**

84.     Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets, generally $1 million or more, and

therefore greater bargaining power. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

85.     Collective trusts, or "CITs", are akin to low-cost share classes because many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual fund, except they cost less.

86.     ERISA is derived from trust law. *Tibble I*, 135 S. Ct. at 1828. Accordingly, the Supreme Court has stated that where ERISA is silent, courts should seek guidance from trust law. *Varity Corp v. Howe*, 516 U.S. 489, 496-97 (1996). One such area is the selection of appropriate funds for a plan. Trust law states it depends on "the type of trustee and the nature of the breach involved, the availability of relevant data, and other facts and circumstances of the case." Restatement (Third) of Trusts, § 100 cmt. b(1). To determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." *Id.* (emphasis added).

87.     Plan fiduciaries like Defendants must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees. Some of the best investment vehicles for these goals are collective trusts, which pool plan participants' investments further and provide lower fee alternatives to even institutional and 401(k) plan specific shares of mutual funds.

88.     Despite the advantages of collective trusts, as of June 2020, the Plan did

not include any collective trusts other than the Wells Fargo Stable Return Fund, but instead offered only mutual funds despite the availability of lower cost collective trust versions of the exact same investment offerings, particularly the JPMorgan SmartRetirement target date funds. Defendants breached their fiduciary duties by failing to continually monitor the investment management fees of the target date funds to ensure they were reasonable.

89.     A clear indication of Defendants' lack of a prudent investment evaluation process was their failure to identify and select available lower cost collective trusts. As demonstrated in the chart below, Defendants selected mutual fund versions of the JPMorgan SmartRetirement target retirement date funds with significantly higher expense ratios than the typical collective investment trusts offered by JPMorgan. A prudent fiduciary conducting an impartial review of the Plan's investments would have identified these lower cost collective trusts at the earliest opportunity. Here, the following funds in the Plan as of June 2020 were available as lower cost collective trusts throughout most of the Class Period:

| Fund in Plan | Expense Ratio[18] | Lower Cost Alternatives | Expense Ratio[19] | Inception Date of Fund | % Fee Excess |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2025 R6 | 0.46% | JPMorgan SmartRetirement 2025 - CF Class | 0.44% | 7/22/2016 | 4.4% |
| JPMorgan SmartRetirement 2030 R6 | 0.47% | JPMorgan SmartRetirement 2030 - CF Class | 0.44% | 7/22/2016 | 6.5% |
| JPMorgan SmartRetirement 2035 R6 | 0.48% | JPMorgan SmartRetirement 2035 - CF Class | 0.44% | 7/22/2016 | 8.6% |

[18] As of June 30, 2020, as reported in the Participant Disclosure of Plan and Investment Related Information.

[19] As of 2019.

| Fund in Plan | Expense Ratio | Lower Cost Alternatives | Expense Ratio | Inception Date of Fund | % Fee Excess |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2040 R6 | 0.49% | JPMorgan SmartRetirement 2040 - CF Class | 0.44% | 7/22/2016 | 10.7% |
| JPMorgan SmartRetirement 2045 R6 | 0.49% | JPMorgan SmartRetirement 2045 - CF Class | 0.44% | 7/22/2016 | 10.7% |
| JPMorgan SmartRetirement 2050 R6 | 0.49% | JPMorgan SmartRetirement 2050 - CF Class | 0.44% | 7/22/2016 | 10.7% |
| JPMorgan SmartRetirement 2055 R6 | 0.50% | JPMorgan SmartRetirement 2055 - CF Class | 0.44% | 7/22/2016 | 12.7% |
| JPMorgan SmartRetirement 2060 R6 | 0.59% | JPMorgan SmartRetirement 2060 - CF Class | 0.44% | 7/22/2016 | 29.1% |

90.     The above alternative funds also outperformed the Plan's funds in their 3- and 5-year average returns as of 2020.

91.     Moreover, these alternative investments had no material difference in risk/return profiles with the Plan's funds and there was a high correlation of the alternative funds' holdings with the Plan's funds holdings such that any difference was immaterial.

92.     Defendants should have anticipated such underperformance given the wealth of data showing that over the long-term, actively managed funds do not outperform their passively managed counterparts. Indeed, as shown in the table below, the majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019:

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark In 5 Years |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 % |
| Mid-Cap | S&P MidCap 400 | 63.56 % |
| Small-Cap | S&P SmallCap 600 | 75.09 % |
| Multi-Cap | S&P Composite 1500 | 82.79 % |
| Domestic Equity | S&P Composite 1500 | 81.66 % |
| Large-Cap Value | S&P Value | 84.74 % |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 % |
| Small-Cap Value | S&P SmallCap 600 Value | 90.57 % |
| Multi-Cap Value | S&P Composite 1500 Value | 91.35 % |

93.     The table above is for illustrative purposes only, as the significant fee disparities detailed herein existed throughout the Class Period. The Plan expense ratios were multiples of what they should have been given the Plan's bargaining power, which Defendants failed to utilize adequately for the benefit of the Plan and its participants. Indeed, a careful and prudent investigation would have revealed the existence of numerous lower-cost and better performing alternatives to the Plan's funds.

**E.      Defendant Imprudently Retained Historically Underperforming Plan Investments**

94.     Given Defendants' failure to conduct appropriate due diligence in selecting and retaining Plan investments, numerous investment options underperformed their benchmarks (as well as lower-cost alternative investments that were available to the Plan).

95.     Prudent fiduciaries of mega defined contribution plans must regularly analyze the Plan's investment options to determine whether its actively managed funds

will outperform their benchmark, net of fees. Prudent fiduciaries then make a reasoned decision as to whether it would be in the participants' best interest to continue to offer that particular actively managed option for the particular investment style and asset class.

96.     Defendants failed to undertake such an analysis when they selected and retained the actively managed funds discussed below. Defendants provided these fund options without conducting a prudent analysis despite the acceptance within the investment industry that active managers typically do not outperform passive managers net of fees over the long-term.

97.     Had such an analysis been conducted by Defendants, they would have determined that the actively managed funds discussed below underperformed their respective benchmarks over extended periods. Indeed, these funds discussed below have demonstrated persistently poor performance for many years compared to the benchmarks that are used as the appropriate yardsticks to evaluate these fund's investment results.

98.     Defendants' failure to remove these consistently underperforming investments demonstrates the absence of a prudent process to evaluate the Plan's investment offerings. Had Defendants adopted prudent processes in order to discharge their fiduciary duties, the funds below would have been placed on watchlists and tracked on a regular basis to determine if the reason for their poor performance had persisted – in which case the funds should have been removed – or whether the underperformance was merely the result of a transient market trend or some other factor that would correct

itself within a reasonable period of time.

99.     Among the Plan's perennial underperforming investment options are the JPMorgan SmartRetirement target retirement date funds for 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055 and 2060, which, on information and belief, have unreasonably high expense ratios ranging from 0.45% for the 2020 target date fund to 0.59% for the 2060 target date fund, as compared to comparable target retirement date funds such as the Vanguard Institutional Target Retirement funds and BlackRock LifePath Index funds for 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055 and 2060, which have an expense ratio of 0.09% (*i.e.*, a difference of as much as 147%). Such excessive fees alone make the JPMorgan SmartRetirement investments imprudent.

100.     However, the imprudence of the JPMorgan SmartRetirement target retirement date funds is exacerbated by their poor performance relative to their benchmark indices (the Morningstar Lifetime Mod TR USD for 2020, 2025, 2030, 2035, 2040, 2045, 2050, 2055 and 2060), as well as far less expensive target retirement date investment options that were readily available throughout the Class Period, like Vanguard Institutional Target Retirement and BlackRock LifePath Index funds. While each of the JPMorgan SmartRetirement target retirement date funds underperformed their respective benchmark indices and Morningstar fund categories for the 3- and 5-year periods ending on June 30, 2020, the comparable Vanguard Target Retirement date funds and BlackRock LifePath Index funds mirrored or exceeded the performance of the same benchmark indices and Morningstar fund categories. Given such prolonged underperformance, it was imprudent for Defendants to retain the JPMorgan

SmartRetirement target retirement date funds as investment options in the Plan.

101.    Similarly, it was imprudent for Defendants to select and retain the American Beacon Large Cap Value R5 fund, which has an unreasonably high expense ratio of 0.63% and has underperformed comparable investment options that are benchmarked to the same index – the Russell 1000 Value TR USD. Funds with expense ratios as low as 0.17% (a staggering 115**%** difference in cost), outperformed the American Beacon Large Cap Value R5 fund over 1-, 3-, 5- and 10-year periods as of the quarter ended June 30, 2020, as shown below:

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| **IN PLAN** | AADEX **American Beacon Large Cap Value R5** Benchmark Index: Russell 1000 Value TR USD | 0.63% | -10.08 | 0.95 | 3.37 | 9.71 | -1.24 | -0.88 | -1.27 | -0.70 |
| *Low Fee Alternative* | VIVAX **Vanguard Value Index Inv** (superior performance over 1-, 3-, 5- & 10-year periods) | 0.17 % | -7.55 | 3.76 | 6.32 | 11.08 | 1.28 | 1.93 | 1.68 | 0.67 |
| *Low Fee Alternative* | VEIPX **Vanguard Equity-Income Inv** (superior performance over 1-, 3-, 5- & 10-year periods) | 0.27 % | -5.53 | 4.34 | 7.05 | 11.92 | 3.31 | 2.52 | 2.41 | 1.51 |

| Low Fee Alternative | SFLNX **Schwab Fundamental US Large Company Idx** (superior performance over 1-, 3-, 5- & 10-year periods) | 0.25 % | -2.99 | 5.39 | 6.81 | 11.62 | 5.85 | 3.57 | 2.17 | 1.21 |

102.    Another poorly performing investment option that warranted removal during the Class Period is the JPMorgan SmartRetirement Income Fund R6, which has an unreasonably high expense ratio of 0.42%, and routinely falls short of its benchmark index, the Morningstar Lifetime Mod Incm TR USD. It was imprudent for Defendants to select and retain the JPMorgan SmartRetirement Income Fund R6 when there were less expensive investment options available that outperformed the same benchmark index, as shown in the table below:

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| **IN PLAN** | JSIYX **JPMorgan SmartRetirement Income Fund R6** | 0.42 % | 3.12 | 4.48 | 4.37 | 5.81 | -1.23 | -0.61 | -0.17 | 0.07 |
| Low Fee Alternative | VITRX **Vanguard Instl Trgt Retire Inc Instl** | 0.09 % | 5.87 | 5.47 | 5.00 | -- | 1.52 | 0.39 | 0.45 | -- |
| Low Fee Alternative | LIRKX **BlackRock LifePath® Index Retire K** | 0.09 % | 6.50 | 6.00 | 5.53 | -- | 2.15 | 0.91 | 0.99 | -- |
| Low Fee Alternative | FIKFX **Fidelity Freedom® Index Income Investor** | 0.12 % | 6.51 | 5.29 | 4.41 | 4.22 | 2.16 | 0.21 | -0.14 | -1.51 |

103.    Yet another underperforming Plan investment offering is the PIMCO All Asset All Authority Institutional fund, which has an unreasonably high expense ratio of 1.24%, and routinely falls short of its benchmark index, the Morningstar Mod Agg Tgt Risk TR USD. Indeed, this fund has had negative returns over the most recent 1- and 3-year periods, and over the past 10 years has produced a paltry return of only 1.86%. Thus, it was imprudent for Defendants to select and retain the PIMCO All Asset All Authority Institutional fund during the Class Period given its anemic performance, particularly when there were less expensive investment options available that have performed far better, as shown in the table below:

| In Plan/ Low Fee Alternative | Fund | Net Expense Ratio | Average Annual Return (%) | | | | Performance Relative to Benchmark (%) | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | 1Y | 3Y | 5Y | 10Y | 1Y | 3Y | 5Y | 10Y |
| IN PLAN | PAUIX **PIMCO All Asset All Authority Institutional** Benchmark Index: Morningstar Mod Agg Tgt Risk TR USD | 1.24 % | -7.19 | -0.99 | 0.83 | 1.86 | -8.65 | -6.76 | -5.46 | -7.11 |
| *Low Fee Alternative* | AQRIX **AQR Multi-Asset I** | 0.82 % | -1.60 | 4.74 | 3.96 | -- | -3.07 | -1.04 | -2.33 | -- |
| *Low Fee Alternative* | EIRAX **Eaton Vance Rich Bern All Asst Strat I** | 1.09 % | 4.95 | 4.23 | 5.17 | -- | 3.48 | -1.54 | -1.11 | -- |

104.    In 2015, the Supreme Court unanimously ruled that ERISA fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015). In contrast to the conduct of a prudent fiduciary, Defendants failed to conduct a prudent process to monitor the funds discussed above and they continue to retain these funds despite their continuing underperformance

compared to their benchmarks. Moreover, as shown above, there were abundant lower-cost investment alternatives readily available to the Plan for each of these investments.

105.    Prudent fiduciaries of defined contribution plans must continuously monitor the investment performance of plan options against applicable benchmarks and peer groups to identify underperforming investments. Based on this process, prudent fiduciaries replace those imprudent investments with better performing and reasonably priced options. Under the standards used by prudent independent fiduciaries, the funds discussed above would have been removed from the Plan.

106.    Had the Defendant removed these funds from the Plan and the amounts been invested in any of the lower-cost alternatives identified herein, participants in the Plan would not have lost millions of dollars' worth of their retirement savings.

### F.    Defendants Failed to Monitor or Control the Plan's Recordkeeping and Administrative Expenses

107.    The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper." Beyond simple provision of account statements to participants, it is quite common for the recordkeeper to provide a broad range of services to a defined contribution plan as part of its package of services. These services can include claims processing, trustee services, participant education, managed account services, participant loan processing, Qualified Domestic Relations Order ("QDRO") processing, preparation of disclosures,

self-directed brokerage accounts, investment consulting, and general consulting services.

108.    Nearly all recordkeepers in the marketplace offer this range of services, and defined contribution plans have the ability to customize the package of services they receive and have the services priced accordingly. Many of these services can be provided by recordkeepers at very little cost. In fact, several of these services, such as managed account services, self-directed brokerage, QDRO processing, and loan processing are often a profit center for recordkeepers.

109.    The market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service. As a result of such competition, vendors vigorously compete for business by offering the best price.

110.    The cost of providing recordkeeping services depends on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.

111.    Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both). Revenue sharing payments are derived from investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

112.   Utilizing a revenue sharing approach is not *per se* imprudent. Plaintiffs are not making a claim against Defendants for using revenue sharing to pay recordkeeping fees.

113.   However, when revenue sharing is left unchecked, it can be devastating for Plan participants. "At worst, revenue sharing is a way to hide fees. Nobody sees the money change hands, and very few understand what the total investment expense pays for. It is a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of). In some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees."[20]

114.   Because revenue sharing payments are asset based, they bear no relation to a reasonable recordkeeping fee and can provide excessive compensation. Again, it is important to emphasize that fees obtained through revenue sharing are tethered not to any actual services provided to the Plan; but rather, to a percentage of assets in the Plan and/or investments in mutual funds in the Plan. As the assets in the Plan increase, so too increases the recordkeeping fees that Capital Research pockets from the Plan and its participants. One commentator likened this fee arrangement to hiring a plumber to fix a leaky gasket but paying the plumber not on actual work provided but based on the amount of water that flows through the pipe. If asset-based fees are not monitored, the fees skyrocket as more money flows into the Plan.

---

[20]   Available at:  http://www.cccandc.com/p/revenue-sharing-and-invisible-fees  (last visited Sept. 22, 2020).

115.   It is well-established that plan fiduciaries have an obligation to monitor and control recordkeeping fees in order to ensure that such fees remain reasonable. *See*, *e.g.*, *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014) ("*Tussey II*") (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan). Excessive expenses "decrease [an account's] immediate value" and "depriv[es] the participant of the prospective value of funds that would have continued to grow if not taken out in fees." *Sweda*, 923 F.3d at 328. No matter the method of payment or fee collection, the fiduciary must understand the total amount paid the recordkeeper and per-participant fees and determine whether pricing is competitive. *See Tussey II*, 746 F.3d at 336. Thus, defined contribution plan fiduciaries have an ongoing duty to ensure that the recordkeeper's fees are reasonable.

116.   Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. First, they must closely monitor the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and stand-alone pricing reports.

117.   Second, in order to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify *all* fees, including direct compensation and so-called "indirect" compensation through revenue sharing being

paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries closely monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

118. Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015).

119. Defendants have failed to prudently manage and control the Plan's recordkeeping costs by failing to undertake any of the aforementioned steps. Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") has been the Plan's recordkeeper since at least 2012 (with no change). If Defendants had undertaken an RFP since 2012 in order to compare Merrill Lynch's costs with those of others in the marketplace, Defendants would have recognized that Merrill Lynch's direct compensation for

recordkeeping services during the Class Period has been unreasonable. From 2012 to 2018 the direct annual recordkeeping per participant fees were as follows:

| Year | Direct Recordkeeping Fees |
|------|---------------------------|
| 2012 | $15 |
| 2013 | $14 |
| 2014 | $20 |
| 2015 | $43 |
| 2016 | $50 |
| 2017 | $48 |
| 2018 | $55 |

120.   Further, by comparison to other plans, the fees are excessive and unreasonably high. For instance, the 401k Averages Book (20th ed. 2020), examined recordkeeping fees for plans with less $200 million in assets (*i.e.*, substantially smaller than the Plan), and demonstrated that as plans increase in size the costs of recordkeeping generally decrease on a per participant basis—a classic example of economies of scale. But here the opposite is happening.

121.   A plan with 200 participants and $20 million in assets, the average recordkeeping and administration cost (through direct compensation) is $12 per participant. 401k Averages Book at 95. A plan with 2,000 participants and $200 million in assets, the average recordkeeping and administration cost (through direct compensation) is $5 per participant. *Id*. at 108. Defendant caused Plan participants to pay excessive fees.

122.   Moreover, Merrill Lynch did not receive only the direct compensation set forth above—it received far more compensation for recordkeeping and other administrative services through revenue sharing payments. Such revenue sharing payments are particularly problematic because they are asset-based, and they usually

bear no relation to a reasonable recordkeeping fee. Rather, in large plans, like this one, revenue sharing often results in excessive compensation, especially like here, when high-priced funds are included as plan investment options.

123.   As one industry expert has noted: "If you don't establish tight control, the growth of your plan's assets over time may lead to higher than reasonable amounts getting paid to service providers. This is because most revenue sharing is asset-based. If a recordkeeper's workload is about the same this year as last, why should they get more compensation just because the market had a big year and inflated the asset base? In a large plan, this phenomenon can lead to six figure comp bloat over time. That's bad for plan participants and bad for fiduciaries." Jim Phillips, *(b)est Practices: What Do You Know About Revenue Sharing?*, PLANSPONSOR.com (June 6, 2014).

124.   Another problem is that "revenue sharing is not equivalent among all funds; some funds pay no revenue sharing and others pay different revenue-sharing rates. The issue then arises that it may not be fair for some participants to pay a higher expense ratio because revenue sharing is built in. Another concern is that plan participants who invest in more expensive, revenue-sharing funds are bearing a disproportionate amount of the plan's administrative costs compared with their coworkers who have chosen funds without revenue sharing." Jennifer DeLong, *Coming to Grips with Excess Revenue Sharing*, Context, The AllianceBernstein Blog on Investing (June 2014).[21] Thus, prior to the Class Period, AllianceBernstein noted, "the

---

[21]   Available   at:   https://blog.alliancebernstein.com/post/en/2014/06/coming-to-grips-with-excess-revenue-sharing (last visited Sept. 22, 2020).

prevalence of revenue sharing is decreasing as more plans rethink their strategies for making plan fees more transparent." *Id.*

125.    As recognized prior to the Class Period, the best practice is a flat price based on the number of participants in a plan, which ensures that the amount of compensation will be tied to the actual services provided and that the recordkeeping fees will not fluctuate or change based upon, *e.g.*, an increase in assets in the plan. Indeed, in May 2014, AllianceBernstein advised: "DC plans and their fiduciaries may be better served to modify or change the plan design a bit, and it might be wise to consider removing excess revenue sharing from the picture altogether. One route to that solution would be to consider share classes or investment vehicles with lower—or no—revenue-sharing rates." Daniel Noto, *Rethinking Revenue Sharing*, AllianceBernstein (May 2014).[22]

126.    The Plan's total expenses for recordkeeping reveals the true extent of Defendants' fiduciary breaches. The total amount of recordkeeping fees (both through direct and indirect payments) currently is at least $75 per participant annually – when a reasonable fee ought to be no more than $25 per participant annually.

127.    As noted above, some plans pay recordkeepers fees in addition to direct compensation in the form of revenue sharing. Here, the Plan paid Merrill Lynch a fortune in direct and indirect compensation for recordkeeping services throughout the

---

[22]    Available    at:    https://www.alliancebernstein.com/Research-Publications/CMA-created-content/Institutional/Instrumentation/DC_RethinkingRevenueSharing.pdf   (last visited Sept. 22, 2020).

Class Period.

128.    The recordkeeping fees are far greater than recognized reasonable rates for large and mega plans. Given the size of the Plan's assets during the Class Period, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to superior to the typical services that would have been provided to the Plan by Merrill Lynch. Merrill Lynch performs tasks for the Plan such as validating payroll data, tracking employee eligibility and contributions, verifying participant status, recordkeeping and information management (computing, tabulating, data processing, etc.)

129.    The services that Merrill Lynch provided were nothing out of the ordinary, and a prudent fiduciary would have observed the excessive fees being paid to the recordkeeper and taken corrective action. Defendants' failures to monitor and control recordkeeping compensation cost the Plan millions of dollars during the Class Period and constituted a breach of the duty of prudence.

**FIRST CLAIM FOR RELIEF**
**Breaches of Fiduciary Duties of Prudence**
**(Asserted against Stantec Consulting and Committee Defendants)**

130.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

131.    At all relevant times, the Company and Committee Defendants ("Prudence Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or

control over the administration and/or management of the Plan or disposition of the Plan's assets.

132.   As fiduciaries of the Plan, Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the Plan's fees and assets for the sole and exclusive benefit of Plan participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

133.   The Prudence Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the interest of Plan participants. Instead, the Prudence Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. In addition, the Prudence Defendants failed to investigate separate accounts and/or collective trusts as alternatives to certain mutual funds, even though they generally provide the same investment management services at a lower cost. Moreover, the Prudence Defendants failed to investigate stable value funds as an alternative to money market funds, even though stable value funds credit participants with substantially higher interest rates without increased risk. Likewise, the Prudence Defendants failed to monitor or control

the grossly excessive compensation paid for recordkeeping services.

134.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had Prudence Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

135.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), the Prudence Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

136.    The Prudence Defendants knowingly participated in each breach of the other Prudence Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries**
**(Asserted against Stantec Consulting and the Board Defendants)**

137.    Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

138.    Stantec Consulting and the Board Defendants (the "Monitoring Defendants") had the authority to appoint and remove members of the Committee and were aware that the Committee Defendants had critical responsibilities as fiduciaries of the Plan.

139.    In light of this authority, the Monitoring Defendants had a duty to monitor the Committee Defendants to ensure that the Committee Defendants were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee Defendants were not fulfilling those duties.

140.    The Monitoring Defendants also had a duty to ensure that the Committee Defendants possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Stantec Consulting and the Board Defendants.

141.    Stantec Consulting and the Board Defendants breached their fiduciary monitoring duties by, among other things:

    (a)    Failing to monitor and evaluate the performance of the Committee Defendants or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee Defendants' imprudent actions and omissions;

    (b)    failing to monitor the processes by which Plan investments were evaluated, their failure to investigate the availability of lower-cost share classes, and their failure to investigate the availability of lower-cost separate account and collective trust vehicles; and

    (c)    failing to remove Committee members whose performance was

inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and Plan participants' retirement savings.

142.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses. Had Stantec Consulting and the Board Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

143.    Pursuant to 29 U.S.C. § 1109(a) and 1132(a)(2), Stantec Consulting and the Board Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee Defendants. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in her Prayer for Relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A.    A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Fed. R. Civ. P. 23(b)(2);

B.    Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C.    A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D.    An Order compelling the Defendants to make good to the Plan all losses

to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Employer Defendants as necessary to effectuate said relief, and to prevent the Employer Defendants' unjust enrichment;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

I.     An award of pre-judgment interest;

J.     An award of costs pursuant to 29 U.S.C. § 1132(g);

K.     An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the

common fund doctrine; and

      L.      Such other and further relief as the Court deems equitable and just.

DATED: September 23, 2020          Respectfully submitted,

                            **MCKAY LAW, LLC**

                            */s/ Michael C. McKay*
                            5635 N. Scottsdale Road, Suite 117
                            Scottsdale, Arizona 85250
                            Telephone: (480) 681-7000
                            Facsimile: (480) 348-3999
                            Email: mmckay@mckaylaw.us

                            Marc H. Edelson (*pro hac vice* anticipated)
                            Eric Lechtzin (*pro hac vice* anticipated)
                            **EDELSON LECHTZIN LLP**
                            3 Terry Drive, Suite 205
                            Newtown, Pennsylvania 18940
                            Telephone: (215) 867-2399
                            Facsimile: (267) 685-0676
                            Email: medelson@edelson-law.com
                            Email: elechtzin@edelson-law.com

                            *Attorneys for Plaintiffs and the proposed Class*